### THORP et al.
### v.
### AMERICAN AVIATION AND GENERAL INSURANCE COMPANY et al.

#### Nos. 11159, 11155.

United States Court of Appeals Third Circuit.

Argued Jan. 19, 1954.

Decided May 19, 1954.

Rehearing Denied June 11, 1954.

Harold E. Kohn, Philadelphia, Pa. (Dilworth, Paxson, Kalish & Green, Philadelphia, Pa., on the brief), for plaintiffs (appellants in 11,159).

Horace Michener Schell, Philadelphia, Pa. (Sydney C. Orlofsky, Philadelphia, Pa., A. Millard Taylor, Camden, N. J., on the brief), for defendants (appellants in 11,155).

Before McLAUGHLIN, KALODNER and STALEY, Circuit Judges.

KALODNER, Circuit Judge.

This is an action brought by the plaintiffs, Harold G. Thorp (individually and trading as Runnemede Theatre) and Florence Thorp, on six policies of fire insurance, all in the same form, issued by the six defendant insurance companies. Plaintiffs were the owners of the Runnemede Theatre located in Runnemede, New Jersey, on which they carried fire insurance in a total amount of $80,000. Of the latter total, $65,000 was attributable to policies issued by the defendants, of which $55,000 was on the building, $9,000 on the contents of the projection booth, and $1,000 on furniture, fixtures and equipment.[1] The poli-

---

1. Defendants' brief discloses that the remaining $15,000 of insurance was carried with two other companies, against whom a separate action has been taken, because service could not be made upon them in Pennsylvania.

cies provided that the companies insured plaintiffs " * * * to the extent of the *actual cash value* of the property at the time of loss, but not exceeding the amount which it would cost to repair or replace the property with material of like kind and quality within a reasonable time after such loss * * * against all Direct Loss by Fire * * * " (emphasis supplied).

On February 9, 1950, a fire occurred in the insured premises, resulting in substantial damage. In their Complaint filed September 19, 1950, plaintiffs alleged that "Each and every of the said defendants has failed and refused to pay the sums due plaintiffs under the respective policies."

The trial resolved itself primarily into an issue of fact as to the amount of the "actual cash value" of the insured property at the time of the loss. After his charge, the trial judge submitted interrogatories to the jury.[2] The questions to be answered and the jury's findings were as follows:

"1. What was the actual cash value of the building? $61,500.

"2. What was the actual cash value of the furniture, fixtures, and equipment, exclusive of the contents of the booth? $12,000.

"3. What was the actual cash value of the contents of the booth? $8,000."

At the direction of the District Court, judgment was then entered on the special verdict of the jury against each insurance company in the proportion which its coverage bore to the total insurance on the particular type of property.[3] This amounted to a total award of $60,950.42. No interest was included in the judgment.

Defendants filed a Motion for New Trial, setting forth 65 reasons, a Motion to Set Aside Findings of the Jury, setting forth 10 reasons, and a Motion for Findings by Court and for Judgment for Defendants. These motions were all denied.

Plaintiffs filed a Motion to Amend Judgment, to add interest thereto from the time of the fire on February 9, 1950, to the time of the findings by the jury on December 11, 1952. This motion was granted and interest was awarded at the rate of three percent per annum for that period. The District Court also ordered that interest should run on the amended judgment from December 11, 1952, at the legal rate of six percent per annum.

Defendants appealed from the final judgment as amended. Plaintiffs cross-appealed from the award of interest at the rate of three percent instead of six percent for the period from the date of the fire on February 9, 1950, to the time of the findings by the jury on December 11, 1952.

As to defendants' appeal (No. 11,155):

Defendants complain (1) the trial judge did not adequately charge the jury; (2) the jury's verdict was "contrary to the law, the evidence and the weight of evidence"; (3) the trial judge erred in his rulings as to admissibility of certain documentary evidence; (4) plaintiffs' counsel was guilty of prejudicial conduct; and (5) there was an erroneous allowance of interest.

The crux of the defendants' contention on the first point is that the trial judge failed to instruct the jury adequately on the legally established methods of determining the critical question involved —the "actual cash value of the property at the time of the loss."

 This contention comes with mighty poor grace from the defendants. First, they did not object to, or call to the trial judge's attention, any error or in-

---

2. Federal Rules of Civil Procedure 49(a), 28 U.S.C.A. "Special Verdicts. The court may require a jury to return only a special verdict in the form of a special written finding upon each issue of fact. * * *"

3. Federal Rules of Civil Procedure 58. "Entry of Judgment. * * * the court shall direct the appropriate judgment to be entered upon a special verdict * * *."

adequacy in his charge before the jury retired as they were required to do by Rule 51 of the Federal Rules of Civil Procedure.[4] Second, the trial judge charged the jury as to the standard of proof with relation to "actual cash value" in conformity with the defendants' own declared view of the applicable law.[5] In doing so he affirmed 14 of Defendants' Points for Charge in their entirety, two others in part and denied only six, which were either merely repetitious or clearly erroneous as put. In sharp contrast, he denied 15 of Plaintiffs' Points for Charge, affirmed one in part and two as requested. Reverting briefly to the de-

fendants' failure to make timely objection to the alleged errors or inadequacy in the charge, we observe that while there may be exceptional cases which will prompt an appellate court to consider grounds of error not raised below, review in such instances should be exercised only where injustice might otherwise result [6] and in the instant case not only is there a total absence of exceptional circumstances which would justify departure from the salutary rule stated but to the contrary, the record discloses that the trial judge's charge was, to say the least, more than merely favorable to the defendants.[7]

4. Rule 51 of the Federal Rules of Civil Procedure provides:

"* * * No party may assign as error the giving or the failure to give an instruction unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection. * * *"

The purpose of Rule 51 is to inform the trial judge of possible errors so that he may have an opportunity to reconsider his charge and if necessary to correct it. Green v. Reading Co., 3 Cir., 1950, 183 F.2d 716.

5. There was at the trial, considerable dispute between the parties as to the applicable standard of proof to establish "actual cash value". While the parties were in agreement that since the policies were issued in New Jersey, the law of that state controlled, the difficulty presented itself that their research had failed to disclose a New Jersey decision defining the standard of proof establishing "actual cash value". Under the circumstances the trial judge was constrained to resort to general applicable principles to reach a conclusion consistent with New Jersey law. The Continental Assurance Co. v. Conroy, 3 Cir., 1954, 209 F.2d 539. The plaintiffs urged that New Jersey would subscribe to the view prevailing in Pennsylvania that "Actual cash value in a policy of insurance means what it would cost to replace a building or a chattel as of the date of the fire", Fedas v. Insurance Co. of Pennsylvania, 1930, 300 Pa. 555, 562, 151 A. 285, 288. The defendants contended that New Jersey would subscribe to the New York rule (McAnarney v. Newark Fire Ins. Co., 1928, 247 N.Y. 176, 181, 159 N.E. 902, 903, 56 A.L.R. 1149, which permits the

widest latitude on the ascertainment of "actual cash value" so that evidence is admissible not only as to cost of reproduction but "as [to] any other fact reasonably tending to throw light upon the subject."

That the trial judge was persuaded by the defendants to their view is conclusively demonstrated by the affirmance of defendants' second point for charge (set forth in Note 7, infra) which is an almost verbatim quotation from the McAnarney opinion, and the wide and sweeping latitude of the testimony adduced.

6. Hormel v. Helvering, 1941, 312 U.S. 552, 61 S.Ct. 719, 85 L.Ed. 1037; Dowell, Inc. v. Jowers, 5 Cir., 1948, 166 F.2d 214, 2 A.L.R.2d 442, certiorari denied, 1948, 334 U.S. 832, 68 S.Ct. 1346, 92 L.Ed. 1759.

7. For example, the trial judge affirmed Defendants' Point 2:

"In determining the actual cash value of the property here involved, you may consider every fact and circumstance which would logically tend to the formation of a correct estimate of the loss, including the original cost of the building, the opinions of value given by qualified witnesses; declarations against interest which may have been given by the assured; the gainful uses to which the building might have been put; the economic value of the theatre; its age, condition, physical wear and tear; its rental value; the income of the building from the use to which it was put; obsolescence both structural and functional; and its market value; and all kinds of depreciation and deterioration to which it has been subjected."

and Defendants' Point 14:

"In arriving at the actual cash value of the building you may consider that dur-

As to defendants' second point: was the jury's verdict "contrary to the law, the evidence and the weight of the evidence."

The crux of this contention is that certain testimony was incompetent on the critical issue of "actual cash value" and as such should not have been submitted to the jury. It is directed at the testimony of plaintiffs' value witnesses—Whitaker, Blumberg, Seidman and Freedman.

Upon consideration of the record we are convinced that the testimony of these witnesses was competent.

Whitaker had been engaged as a contractor and builder since 1921. His experience was extensive, including the construction of stores, garages, showrooms, apartments and bank buildings. He testified that he was familiar with the Runnemede Theatre before the fire; that he lived in Merchantville, New Jersey, and quite often travelled through Runnemede, passing the theatre which was situated on the Black Horse Pike. After the fire, on October 23, 1951, and on six or seven subsequent occasions, he observed the burned premises. The perimeter of the building, the heights of the walls, and other measurements were taken by him, with the purpose of developing a plan from which he could estimate reconstruction costs. For some of his measurements he relied on photographs that were taken of the building immediately after the fire. Among other things, he took note of the type of construction of the building. His plan of reconstruction duplicated the theatre as it was before the fire. He estimated reconstruction costs "on the basis of quantities and unit prices." Giving credit for salvage, he testified that the reconstruction cost would be $130,803.31.

■ This testimony was clearly admissible. It cannot be gainsaid that Whitaker had sufficient acquaintance with the matters as to which he testified. The foregoing account of his activities which eventuated in his estimate of reconstruction cost reveals a substantial basis for the competency of his testimony.

So also, the testimony of Blumberg, Seidman and Freedman was competent.

■ Before any of them had taken the stand, plaintiff, Harold Thorp, had described the building and its contents in great detail. His testimony as to the condition of the projection booth was corroborated by Haggerty, a moving picture equipment maintenance man. With this groundwork laid, Blumberg, Seidman and Freedman testified solely as to the replacement costs of the specific items of equipment and property disclosed by the evidence as having been in the building at the time of the fire.

■ This testimony was relevant in ascertaining the "actual cash value" of the theatre and its contents at the time of the loss. Moreover, no proper objection can be made to the qualifications of these three witnesses. Blumberg, who testified as to what it would cost to replace the projection booth equipment and certain other articles (e. g. screen curtain track, carpet, ticket box) had been in the motion picture

ing its entire existence as a theatre the management lost money in its operation, despite good management; that it had the last clearance and run on all pictures except of one distributor; that it was affected by a water condition which wet the theatre and its contents; that there is no sewerage system in Runnemede; that the effective drawing power of the theatre was only three or four miles radius; that the average daily receipts for six weeks prior to the fire was less than $45.00; that the average daily receipts for the last six months of 1949 were less than $55.00; that some 66 theatres in the Philadelphia and South Jersey area had been closed down, abandoned, or converted to other uses in the period shortly before and subsequent to the fire and to the present date; that the theatre had no air-conditioning in operation and that the increase in the distribution of television sets had adversely affected the income of motion picture theatres at the time of the fire, and all other pertinent and credible facts which have been testified to in this case.

equipment and supply business for approximately 35 years and supplied most of the Philadelphia area. Seidman, whose testimony concerned the replacement costs of screen curtain, screen masking, side pieces and other related equipment, had been engaged in the interior decoration of theatres for 26 years and operated in several states. Lastly, Freedman, who testified with regard to electrical costs, such as border lights and wiring for the sound system, was an electrical contractor, doing a substantial amount of theatre work and listing as some of his customers, Warner Brothers, Paramount and MGM.

■ The testimony of Whitaker, Blumberg, Seidman and Freedman amply supported the findings of the jury.

As to defendants' third point that the trial judge erred in his rulings as to admissibility of certain documentary evidence:

This point relates to the admission into evidence of "Notice of Loss" reports sent by plaintiffs' insurance brokers, Obus and Colson to the defendants; "Acknowledgment of Assignment of Loss" reports sent by Horter (the adjuster for each of the defendants except Sun Underwriters) to the defendant companies; and a "Report of Important Loss Assignment" which was an inter-office communication of the General Adjustment Bureau, the adjuster for Sun Underwriters. These papers contained statements relative to the amount of the loss and were admitted into evidence over the objections of the defendants as memoranda made in the regular course of business. It is defendants' contention that these reports were not admissible under the Pennsylvania Uniform Business Records as Evidence Act[8] nor the Federal Business Records Act.[9]

However, after a careful examination of the record we are constrained to believe that even if their admission was technically erroneous, the error was, nevertheless, harmless.

■ Plaintiffs' witnesses had testified in great detail, item by item, as to the value of the theatre building and its contents at the time of the loss. With such testimony before the jury we are not persuaded that these reports had any significant effect upon its verdict. They were merely cumulative to the ample evidence already in the record.

Furthermore, it should be noted that in only two of the reports here under consideration was there any estimate of the extent of the loss expressed in dollars. The rest merely contained general statements as to the state of the building and its contents after the fire; i. e. "Probable Total Loss" and "Total (loss) to bldg. & contents." Since there was no substantial dispute as to the value of the property *subsequent to the fire*, the admission of these latter reports could hardly be considered prejudicial error. As aforementioned, the trial had resolved itself primarily into a controversy over what was to be regarded as the value of the theatre and its contents *at the time of the fire*.

■ Likewise, we have concluded that any error committed by the trial judge in admitting into evidence and then later sending into the jury room a paper which plaintiffs' witness Whitaker had used to refresh his recollection, did not affect the substantial rights of the defendants. Everything contained therein had been testified to by Whitaker while on the witness stand and it added nothing of substance to the plaintiffs' case. See Masterson v. Pennsylvania R. Co., 3 Cir., 1950, 182 F.2d 793, 797.

■ Insofar as the rulings made by the trial judge during the plaintiffs' cross-examination of defendants' witnesses are concerned, no reversible error was committed. Great latitude must be given to the exercise of discretion by the trial judge in governing the scope and content of cross-examination. Moreover,

---

8. 28 P.S. § 91b, 1939, May 4, P.L. 42, No. 35, § 2.

9. 28 U.S.C. § 1732.

as stated in Rule 61 of the Federal Rules of Civil Procedure:

"* * * no error * * * in any ruling * * * by the court * * * is ground for granting a new trial or for setting aside a verdict * * * unless refusal to take such action appears to the court inconsistent with substantial justice. * * *"

A painstaking examination of the rulings cited by defendants as erroneous has failed to disclose prejudicial error or any abuse of discretion by the trial judge.

The defendants' fourth point that the plaintiffs' counsel was guilty of prejudicial conduct is so specious as not to merit discussion.

The defendants' point that there was an erroneous allowance of interest of three percent from the date of the fire to the time of the jury's verdict collides with the plaintiffs' contention in their cross-appeal (No. 11,159) that six percent should have been allowed, and the two will be considered together.

We agree with the defendants.

The action was tried in the United States District Court for the Eastern District of Pennsylvania. 113 F.Supp. 764. Accordingly, the District Court was required to look to the Pennsylvania conflict of laws rules in order to determine the proper choice of law with regard to the interest problem. Klaxon Co. v. Stentor Electric Manufacturing Co., 1941, 313 U.S. 487, 61 S. Ct. 1020, 85 L.Ed. 1477. In what appears to be the latest pronouncement by a Pennsylvania court on this subject, it is stated that the question whether any interest is payable is governed by the law of the place where the obligation arose. Dobler v. Shenandoah Life Insurance Co., Inc., 1950, 73 Pa.Dist. & Co. R. 215. In accord are Clark v. Searight, 1890, 135 Pa. 173, 19 A. 941 and Ratterree v. Schonhardt, 1932, 105 Pa.Super. 321, 161 A. 461. Since both parties agree that the policies were contracted in New Jersey, the law of that state governs.

A study of the cases discloses that the rule in New Jersey is that "* * * interest on uncertain and unascertained damages cannot be recovered." Speer v. Van Orden, 1810, 3 N. J.L. 652. An illustration of its application is Philbrick v. Mundy, 1919, 93 N. J.L. 43, 106 A. 361, which was an appeal from a judgment entered upon a verdict in favor of the plaintiff in an action to recover damages for injury to the plaintiff's automobile sustained in a collision with the defendant's automobile. At the trial it appeared that the reasonable value of the repairs to the plaintiff's automobile necessitated by the accident was $879.19. The trial judge instructed the jury that if they found for the plaintiff it should be for that amount with interest from the date of the accident. Accordingly, the jury added interest on $879.19 and rendered a verdict for $1,002.43. The sole ground of appeal was that the trial court had erred in charging the jury to allow interest on an unliquidated claim for damages. The New Jersey Supreme Court held that the appellants were correct in their contention since "Interest is not allowed on unliquidated damages * * *. The reason is that the person liable does not know what sum he owes and therefore cannot be in default for not paying." So also, in Horst Co. v. Peter Breidt City Brewery, 1920, 94 N.J.L. 230, 235, 109 A. 727, 729, where the New Jersey Court of Errors and Appeals in a breach of contract action stated:

"But it is urged the court improperly allowed interest on the amount estimated for the loss on the shipments of hops for the years 1915–1918 * * *. We think this point is well made, and the trial court was in error in allowing interest on these shipments. Interest is not allowed on an unliquidated damage that is not capable of ascertainment by mere computation, for the reason that the person liable does not know what sum he owes; he cannot compute the interest, and therefore he is not in default for not

paying (22 Cyc. 1512; 8 R.C.L. par. 85, p. 533), not on uncertain and unascertained damages (citing cases)."

To the same effect are the more recent cases of Rabinowitz v. Massachusetts Bonding and Insurance Co., 1938, 119 N.J.L. 552, 197 A. 44 and Burton v. Asbestos Limited, Inc., D.C.N.J.1950, 92 F. Supp. 310.

The only New Jersey case cited by the District Court in its opinion [10] dealing with this question was Brown v. Home Development Co., 1941, 129 N.J.Eq. 172, 18 A.2d 742, 746. Authority to award interest was found in the following language from that case which was quoted at length in the District Court's opinion:

" 'Unless a case be found which is a conclusive authority establishing a precedent, the safest way for a court of law or equity is to decide all questions pertaining to interest according to the plainest and simplest considerations of justice and fair dealing * * *. It should be borne in mind that the whole tendency of courts of law and courts of equity for a considerable period of time has been to break away from hard and fast rules and charge and allow interest in accordance with principles of equity, in order to accomplish justice in each particular case.' "

However, an examination of the facts in the Brown case discloses that the claims there involved were liquidated and undisputed, although subject to an unliquidated set-off. Thus, the case seems merely to be an application of the general rule that where the amount of the demand is liquidated or ascertainable, the existence of a set-off or counterclaim which is itself unliquidated, will not prevent the recovery of interest on the balance found to be due, from the time it became due. It has been so interpreted in Hoelzel v. Gavalas and Maskaleris, 1947, 52 A.2d 54, 25 N.J.Misc. 191. Furthermore, in Agnew Co. v. Board of Education of City of Paterson, 1914, 83 N.J.Eq. 49, 89 A. 1046, affirmed 1914, 83 N.J.Eq. 336, 90 A. 1135, the case from which the above quoted language originally stems, the amounts of the claims appear not to have been contested. Accordingly, we do not believe that the language expressed in the Brown and Agnew cases can be properly regarded as manifesting a departure from the strong New Jersey precedents holding that interest will not run on unliquidated damages.

▮▮▮ The New Jersey authorities cited by the plaintiffs do not support a contrary view, and since the damages in the instant case were obviously unliquidated, the District Court committed error in allowing interest to run before the jury had rendered its findings on December 11, 1952.

Finally, the defendants complain of the failure of the trial judge to adopt the interrogatories proposed by them, which were as follows:

"1. What do you find was the actual cash value of the Runnemede Theatre with all of its improvements and contents on February 9, 1950, in place, in the condition in which it stood as a going theatre.

"2. What do you find was the actual cash value of the film and contents of the booth at the Runnemede Theatre on February 9, 1950, in place, in the condition in which it stood.

"3. What do you find was the actual cash value of the furniture and fixtures in place, in the condition in which they were on February 9, 1950.

"4. What do you find was the actual cash value of the building, as covered in the policies of insurance, insuring it, exclusive of the film and contents of booth and the furniture and fixtures therein contained."

Instead, the interrogatories submitted by the District Court to the jury were:

---

10. Thorp v. American Aviation and General Insurance Co., D.C.E.D.Pa.1953, 113 F.Supp. 764.

"1. What was the actual cash value of the building?

"2. What was the actual cash value of the furniture, fixtures, and equipment, exclusive of the contents of the booth?

"3. What was the actual cash value of the contents of the booth?"

 The form of the interrogatories was, of course, in the sound discretion of the District Court, and we are satisfied that those which were propounded to the jury, when viewed in the light of the charge, fully and fairly presented the pertinent issues of the case. See Mourikas v. Vardianos, 4 Cir., 1948, 169 F.2d 53. It was made abundantly clear in the instructions that "The value of the property or the damages recoverable must be determined as of the date of the loss (February 9, 1950)" [11] and that "In determining the actual cash value of the contents of the booth or the actual cash value of the furniture and fixtures * * * (the jury) should value them in place at the Runnemede Theatre, in the condition in which they were, considering their age, depreciation, and obsolescence." [12] Furthermore, we cannot say that in refusing to submit defendants' first requested interrogatory (which the jury would probably have regarded as merely calling for the summation of its responses to the three interrogatories actually submitted) the trial judge stepped beyond the discretion allotted to him.

For the reasons stated the "Order Amending Judgment" of the District Court will be vacated and the cause remanded with directions to proceed in accordance with this opinion.[13] The parties appellants will pay their own costs in this Court.

11. This is defendants' 17th point for charge which was affirmed and read to the jury by the trial judge. Immediately after reading this point, he reinforced it by stating: "I think maybe I have said that, but if I did not I should stress it because it is very important. It is the date of the loss that counts here; that is, February 9, 1950."

12. This is defendants' 21st point for charge which was affirmed and read to the jury by the trial judge.

13. It may be observed that the original "Judgment" entered by the District Court on February 5, 1953, is in accord with the conclusions reached in our opinion.